# Illinois Official Reports

## Appellate Court

> ### *Lederer v. Executive Construction, Inc.*, 2014 IL App (1st) 123170

| | |
|---|---|
| Appellate Court Caption | ROGER LEDERER, Plaintiff-Appellant, v. EXECUTIVE CONTRUCTION, INC., Defendant-Appellee and Third-Party Plaintiff (Midwest Interstate Electrical Construction Company, Defendants, and Alliance Drywall and Acoustical Company, Third-Party Defendant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-3170 |
| Filed | August 29, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for the injuries suffered by a drywall taper employed by a subcontractor who tripped over some exposed and unprotected conduit protruding from the floor of the room where he was using drywall stilts to work on the ceiling, the trial court's entry of summary judgment for defendant general contractor was reversed and the cause was remanded, since there was sufficient evidence to show that defendant had more than a general right of supervision and was potentially subject to liability under section 414 of the Restatement (Second) of Torts, defendant's safety manual specifically prohibited the use of stilts by a subcontractor's employees, and defendant had authority to stop unsafe work and order it remedied. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-L-221; the Hon. Kathy M. Flanagan, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Keith L. Young, of Chicago, for appellant. |
| --- | --- |
| | Franco & Moroney, LLC, of Chicago (Robert J. Franco, Christopher G. Beunik, and Christopher M. Cano, of counsel), for appellee. |
| Panel | JUSTICE PALMER delivered the judgment of the court, with opinion. Presiding Justice Gordon and Justice McBride concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, Roger Lederer, appeals the circuit court's July 26, 2012, grant of summary judgment in favor of defendant-appellee Executive Construction, Inc. (Executive). On appeal, Lederer contends that the circuit court erred in granting summary judgment because section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 414 (1965)) established a duty of reasonable care in the present case. Plaintiff argues that the undisputed facts established, as a matter of law, that the degree of control Executive exercised over the construction project imposed a duty of reasonable care upon Executive. Plaintiff also argues that, as a matter of law, a duty of reasonable care was imposed upon Executive as it had notice of the dangerous condition. For the reasons that follow, we reverse the circuit court's ruling and remand for further proceedings.

¶ 2                                    I. BACKGROUND[1]

¶ 3    Executive was the general contractor for the construction of an office space on several floors of an existing building located at 115 South LaSalle Street (the project) in Chicago, Illinois, for BMO Capital Markets (BMO). Executive subcontracted with Midwest Interstate Electrical Construction Company (Midwest) for the electrical work at the site. Executive also subcontracted with third-party defendant, Alliance Drywall and Acoustical Company (Alliance), for the drywall and acoustical ceiling work at the site. Plaintiff, a drywall taper employed by Alliance at the site, was working on the ceiling of a conference room on the thirty-seventh floor on July 22, 2008, which was his second day on the job. While performing the work, plaintiff stood on stilts to reach the ceiling, and he fell after allegedly tripping over an exposed and unguarded electrical conduit or pipe protruding from the floor in the conference room.

¶ 4    Following the accident, plaintiff filed a personal injury action against Executive and Midwest in 2009. Against Executive, plaintiff alleged negligence for failing to ensure that warning cones were placed over the electrical conduit, failing to remove construction debris

_____

[1]The factual allegations are drawn from the complaint, discovery documents filed in the circuit court, and briefing on the motion to dismiss and attached exhibits.

from the area, failing to warn plaintiff about the conduit, allowing plaintiff to use stilts in performing the drywall work, failing to require the use of a scaffold, and otherwise failing to provide a safe workspace and follow job safety rules. Against Midwest, plaintiff alleged that it failed to place warning cones over the conduit, failed to remove construction debris, failed to warn plaintiff about the conduit, and failed to follow and enforce its own job safety rules. Executive and Midwest both filed third-party complaints against Alliance and counterclaims against plaintiff for contributory negligence. Executive filed a counterclaim for contribution against Midwest.

¶ 5     Executive moved for summary judgment pursuant to section 2-1005 of the Illinois Code of Civil Procedure (the Code) (735 ILCS 5/2-1005 (West 2010)) as to plaintiff's complaint. Executive argued that it owed no duty of care to plaintiff under section 414 of the Restatement (Second) of Torts as it did not retain sufficient control over plaintiff's methods of work or operative details to impose such a duty, and it had no knowledge of the allegedly unsafe conditions. Plaintiff countered that the evidence showed that Executive retained supervisory control over the operative details of his work, had the authority to halt work being done in an unsafe manner and had notice that he was using stilts and of the unsafe conditions, and the use of stilts was prohibited by Executive's safety manual. In connection with the motion, Executive and plaintiff submitted the pertinent construction contracts, safety manuals, and other documentation, along with the deposition testimony of plaintiff and several individuals employed by the parties.

¶ 6                              A. The Contracts and Safety Manuals Involved

¶ 7     Executive had a master contract with BMO that permitted Executive to subcontract portions of the work it did not customarily perform. In a letter that was included with the master contract attached to Executive's motion for summary disposition, Executive vice president Glenn Kamin set forth Executive's proposal for the project and wrote that the services that Executive would provide included "Project Control Coordination and Supervision." The letter indicated that Executive "controls construction activities closely. These activities include subcontractor supervision, quality of workmanship, sequencing of work, material deliveries, documentation of decisions, and adherence to the schedule." Further, the letter stated that the proposed cost the project included, among other things, "Full time site supervision," "Project Management," "First aid supplies & equipment," and "Safety program & OSHA compliance."

¶ 8     Executive and Alliance entered into a master subcontract agreement and a subcontract work order. The master subcontract agreement provided that Alliance "shall perform all work as authorized and described in Work Orders" and that "all work shall be performed in accordance with all OSHA Standards, Subcontractors' Safety Programs, [and] ECI's [Executive's] Safety Program." The subcontract further provided that Alliance "shall furnish all supervision, materials, plant, scaffolding, hoisting, tools, equipment, supplies and all other things necessary for the construction and completion of the work described in the specific project Work Order." Alliance agreed to assume all the obligations and responsibilities that Executive had assumed toward BMO. Additionally, the subcontract required Alliance to "coordinate with other work and shall carefully examine other work, determine whether it is in fit, ready and suitable condition for the proper and accurate performance of the Work hereunder, use all means necessary to discover any defects in such other work, and before

proceeding with the Work hereunder, report promptly any such improper conditions and defects to ECI in writing and allow ECI a reasonable time to have such improper conditions and defects remedied."

¶ 9 The subcontract work order between Executive and Alliance set forth Alliance's scope of work for the project and authorized Alliance to provide "all labor, materials, tools, equipment and supervision required" to complete the work. The scope of work included providing for "all access and scaffolding arrangements necessary to complete the work," coordinating work with the other subcontractors, attending weekly coordination meetings, and complying "with all building rules and regulations."

¶ 10 Attached to the Alliance/Executive contracts was a document entitled "contractor rules and regulations" for the building, which included "EXHIBIT 'G' CONTRACTOR'S SAFETY REQUIREMENTS." This document provided that the contractor was required to prepare and implement a project safety program, "shall require all Subcontractors at any tier to adhere to the Project Safety Program as well, and shall ensure its Subcontractor's actions, policies and programs do not interfere with the Project Safety Program." The document indicated that the contractor would have a project superintendent responsible for implementing and enforcing the safety program, while the subcontractors would have a safety representative who would also ensure compliance with the project safety program, train their employees, conduct weekly "tool box" meetings, and submit written minutes to the project safety coordinator. It also provided that project employees were required to comply with the project safety program and the subcontractor's safety program, safely utilize tools and equipment, and alert supervisors of hazards and dangerous conditions.

¶ 11 Executive and Midwest also entered into a master subcontract agreement and subcontract work order for the project, which, with the exception of the type of work, were identical to those entered into between Executive and Alliance.

¶ 12 In addition, Executive's own safety manual provided that the "supervisor and management are to enforce all safety rules" and the supervisor, project manager, and safety coordinator were "responsible for inspecting the jobsite on a regular basis" for unsafe conditions. It provided that subcontractor employees "should be properly warned when in a dangerous situation," and should warn others when they are aware of such a situation and "report any dangerous or unsafe condition to his supervisor or a safety representative." Additionally, the manual provided that "[t]he use of stilts is not permitted by an ECI or subcontracted employee on ECI job sites."

¶ 13                                              B. Deposition Testimony

¶ 14 Executive's superintendent for the project, Anthony Urso, testified in his deposition that there was a safety preplanning and coordination meeting with the subcontractors before construction began on the project. Executive had a safety coordinator, Melissa Kamin, who reviewed safety policies and ran the safety coordination meeting. She was not on-site on a daily basis, but visited occasionally.

¶ 15 Urso explained that his role as superintendent was to "oversee the project as a whole [and] to oversee the schedule" and report back to his office regarding "manpower, job site duties, scheduling, [and] job coordination." He did not specifically coordinate the work being done between Alliance and other contractors as far as instructing them which rooms they had to work in. Urso testified that he would not say that he had "overall control" of the work done at

the jobsite, but he "would give opinions and/or reiterate our schedules." When asked if Executive scheduled the drywall workers to work in the same room as the electricians at the same time, Urso responded that this would be "micromanaging, which we didn't micromanage the project." Urso gave subcontractors general date guidelines based on the master schedule for the project, which Executive created. The foremen from the subcontractors reported to him on a regular basis and Executive had weekly coordination meetings with the subcontractors. Safety was one of the topics discussed, in addition to the course and schedule of the work. At the weekly meetings, Urso "reiterate[d] that we want everybody to abide by ECI's safety policies. If you were to put a potential hazard there, that you're responsible for protecting that."

¶ 16    Urso testified that he was familiar with Executive's safety manual and indicated that it should have been sent to all subcontractors. However, Urso testified that Executive did not have a specific policy regarding stilts and he did not instruct any subcontractors not to use them; he did not recall seeing anyone use stilts at the project and if he had, he would not have instructed them to stop using stilts. He affirmed that part of his responsibility as superintendent was to ensure "the subcontractors are abiding by what's in the safety policy," and ensure the subcontractors complied with their contractual obligations and the building's safety policies.

¶ 17    Urso was at the jobsite on a day-to-day basis. He did weekly safety inspection walk-throughs of the jobsite, where he inspected the work of Executive and the subcontractors, the conditions of the jobsite, and looked for any unsafe or hazardous conditions created by Executive or a subcontractor. If he noticed a potential safety hazard, such as the accumulation of debris, he or someone from Executive would talk to the subcontractor about addressing it. If he "noticed any potential hazards due to a specific subcontractor, [he] would approach them and have them follow up with the proper safety procedures to draw attention to or protect these hazards." He affirmed that hazards included electrical conduit feeds protruding from the floor, which were installed by the electrical subcontractor. He testified that for one or two instances of an electrical conduit feed being left unguarded, he would "follow up with a verbal to their foreman." If it was a persistent problem, then he would make a written report or note and call Executive's safety coordinator.

¶ 18    When asked if he felt he had the right to stop subcontractors working with inadequate lighting, Urso answered, "I don't feel I have the right to stop their work." When asked if he had the right to stop work that was being done in an unsafe manner where it needed "immediate attention for somebody's personal welfare," Urso responded, "[i]f I feel there is an urge to safety, I would generally pull them away from that task until it's corrected." When asked whether he would have to go through the workers' foreman or if he could address the workers directly, Urso explained that, "[i]t really depends on the safety situation. If I see immediate danger, then I would address the immediate instance and then go to their site foreman." He testified that "if it was something critical where I saw somebody was going to potentially get hurt immediately, I may step in and say, hey, step away from what you're doing, just out of avoiding any injuries. If it was not something critical, it would probably be brought up to their site foreman." Urso testified that he had never stopped a subcontractor's work for safety reasons. He testified that subcontractors were expected to report any unsafe conditions they observed.

¶ 19    Urso testified that it was Midwest's responsibility to protect any hazards it created and Midwest used three-foot-high orange safety cones to cover protruding electrical conduit. He did not expect other subcontractors besides Midwest to cover an exposed conduit if they saw

one. It was not "100 percent expected" that an Executive employee would cover an exposed conduit, but Urso explained "these were topics that we discussed at our safety coordination meetings to protect–as a whole, protect."

¶ 20　　Urso testified that on July 21, 2008, he encountered plaintiff for the first time during Urso's walk-through of the jobsite that morning, and plaintiff remarked to him that the site was "congested." According to Urso, plaintiff made this comment when they were near the freight elevator and lobby area on the thirty-seventh floor, and not in the conference room specifically (where the accident later occurred). Urso responded, "we will look into it." Urso testified that there were construction materials in the vicinity which probably belonged to a variety of subcontractors. Urso did not recall whether he went into the conference room at issue that day, but he explained that the conference room was directly off the entrance by the freight elevator and "[e]verybody that walked onto the site through the freight looked directly into that room." The conference room was missing one wall, so Urso did not need to physically walk into the room to see into it. Urso observed that there were boxes pushed up against the conference room walls; he did not recall the boxes being a tripping hazard as they were stacked neatly against the walls and "you could walk through the center of the room." He did not recall any other materials being stored in that room. With regard to the piece of electrical conduit which protruded from the floor in the conference room, he testified that he never observed it being left uncovered or unguarded. Urso also did not receive any complaints about insufficient lighting at the jobsite and he believed that there were temporary strands of lighting in the hallway starting by the freight elevator area and down the hallway, and light would enter the conference room from the hallway.

¶ 21　　He did not talk to plaintiff on the day of the accident on July 22, 2008. Urso testified that, following the accident, he "didn't give any subcontractors any different specific directions." He generally "reiterate[d] our safety policies." He testified that "[w]e follow up weekly with our safety policies with all subs irregardless [*sic*] of incidents." However, when asked whether Executive took any remedial action after the accident, Urso testified that "[g]enerally, ECI has a policy. They will no longer allow stilts on projects." He did not know the specific date that the policy went into effect.

¶ 22　　Plaintiff testified in his deposition that he worked for Alliance for almost three years before the accident, and had worked as a drywall taper and finisher for over 20 years. He testified that it was common for drywall finishers to work close to other contractors and he was aware that potential safety hazards could arise. He had used stilts since he was 14 years old; he was 57 years old at the time of the deposition. He affirmed that it was customary in his industry to use stilts to do his job, he used them in approximately 50% to 60% of his work, and he felt knowledgeable and qualified to use them.

¶ 23　　Plaintiff began working at the project on July 21, 2008, and the accident occurred the next day on July 22. He denied receiving a safety manual from Alliance, Executive, or any other contractor for the project. He used stilts at the project, which were made of aluminum and were strapped to his legs and could be adjusted in height. Plaintiff testified that Alliance provided him with the stilts and he was issued stilts when he began working for Alliance. He testified that Alliance provided him with several tools in addition to stilts, but he was responsible for bringing them to the jobsite. Alliance provided scaffolds at the site.

¶ 24　　Plaintiff testified that on July 21, 2008, there were hazardous conditions everywhere at the jobsite because of various construction materials on the floor. Plaintiff complained to Urso, the

superintendent for Executive, to Alliance's foreman, John Alonzo, and to the electrical foreman. He testified that he first complained to Urso that "this has got a whole bunch of stuff in here. It's very dangerous." Plaintiff asked if Urso could have some workers clean it up, but Urso "looked at me [plaintiff] and smiled and said I'll see what I can do about it and then he left." He testified that he spoke with Urso for 5 to 10 minutes on July 21. Plaintiff testified that he then went to Alonzo and told him that "[t]here's a lot of stuff in here," and Alonzo instructed two Alliance carpenters to clean up Alliance's materials. Plaintiff also asked the electrical foreman if he could "clean his stuff up," but he told plaintiff to talk to the general contractor. Plaintiff testified that even though the Alliance workers cleaned up, he did not feel that his complaints were fully remedied, but if he refused to keep working, he would lose his job. However, he conceded that no one at Alliance or Executive specifically told him that he would be laid off if he refused to work in potentially hazardous conditions.

¶ 25    While at the jobsite, plaintiff observed electrical conduit protruding from the floors in several rooms where electricians were working. He observed that the electricians would place safety cones on the conduit, take the cones off to pull wires, and then replace the cones. He also observed that the electricians would take the cones and place them outside the rooms where they were working. Although he observed that some cones were removed from the conduits, he did not complain to anyone. He had used stilts around conduit protrusions before.

¶ 26    Plaintiff testified that on July 21, he "jumped all over" while working that day on the thirty-seventh floor, which had several conference rooms and a lobby by the elevator. He worked on stilts for a little bit of the time. He did not observe an electrical conduit protruding from the floor in the conference room (in which the accident occurred the next day) because there were no lights on in the room. He did not believe that room had an electrical conduit protruding from the floor, unlike the other conference rooms on the thirty-seventh floor, because the room was smaller. He did not observe any orange cones on the floor in the conference room. He worked in there for about one hour.

¶ 27    Plaintiff testified that on the day of the accident, July 22, 2008, he worked for two to three hours before the accident occurred. Plaintiff testified that, before he took his break that day, he noticed a safety cone outside the conference room where the accident later occurred. He saw it a couple hours before the accident occurred. Plaintiff did not speak to Urso or make any complaints to the electricians on July 22. Plaintiff testified that the other Alliance drywall taper, Miguel Sandoval, told him he was going to use the scaffold in the lobby area and told plaintiff to use the stilts. Plaintiff indicated that Alonzo and David Ferrarini, Alliance's superintendent, saw him using stilts, and they did not instruct him to stop using them. Plaintiff never complained about using stilts instead of a scaffold.

¶ 28    He did not walk through the conference room at issue beforehand to ensure it was safe. According to plaintiff, he did not observe a scaffold in the room. He testified that he did not move or restack boxes in the conference room before beginning work there, but he later conceded that it was possible that he moved or stacked boxes or other items in that room: "It could have been possible because I did that after break. So I could have been down off my stilts and looked in that room." He testified that he asked Alonzo to check the conference room at issue before he began working in there. He testified that Alonzo was "cleaning a room here and there, and he'd say, yeah, this one's cleaned out," and Alonzo would direct plaintiff to the next room in which he was to start working. When Alonzo "pointed that was the next room," plaintiff construed this to mean it was safe to go in the conference room.

¶ 29    Plaintiff testified that he worked in the conference room for approximately five minutes before he tripped over the protruding electrical conduit with his right foot and fell. He explained that he knew that was what he tripped over because there were boxes hiding it, and it was "the only thing in the room that would have tripped me like that." After he fell, Ferrarini came in the room and unstrapped the stilts. Plaintiff testified that the conduit was in the center of the conference room, but he did not see the conduit before the accident because there was no safety cone on it and there were "all kinds of cabinets around it" and "all kinds of stuff" in the way, including boxes. He believed there were two or three other people in the room at the time, and he knew that there were at least "two [people] because the electricians were working on that, had the cone off." He did not observe them remove the cone and he did not know how long the conduit was uncovered. He testified that there was a safety cone outside of the room. According to plaintiff, there was no lighting in the conference room and the only light came from outside the room, but he did not complain to anyone about the lack of lighting.

¶ 30    Sandoval, the drywall taper working with plaintiff, testified that he received a safety manual from Alliance. He received instructions from Alonzo and he never spoke with any Executive employees about his work. Sandoval also used stilts at the project "[n]early every day." Alliance provided scaffolds and stilts, but the workers brought the stilts with them. He indicated that no one from Alliance directed him to use stilts; it was his own choice. He was familiar with electrical conduits protruding from the floor and he tried to avoid them; he expected an orange cone to be placed over an exposed conduit.

¶ 31    According to Sandoval, on the day of the accident, Alonzo instructed Alliance employees that morning regarding that day's work. Sandoval and plaintiff worked in the conference room at some point. Sandoval indicated that there were boxes and other items in the room, and he and plaintiff stacked them against the wall. He indicated that there was a big light in the room and he had no difficulty seeing. Sandoval saw the electrical conduit protruding from the floor. When asked if plaintiff also saw it, Sandoval testified, "Oh, yeah, he saw it," and indicated that he and plaintiff gestured to each other regarding the conduit. Sandoval testified that they placed a scaffold over the conduit. Sandoval complained to Alonzo regarding the unguarded conduit, and he testified that plaintiff also told Alonzo. Sandoval testified that Alonzo responded that "he was going to talk to either the electricians or the foreman." Alonzo did not instruct them to stop working because of the conduit, but Alonzo advised them "to make sure that it was safe, that we weren't going to fall or anything" and to "stay away from it." Sandoval testified that they worked on the ceiling in the conference room for about one hour and he worked on stilts while plaintiff used the scaffold. He indicated that other workers were in and out of the room during that time to get supplies, but he did not know if anyone from Executive was there and there were no electricians working on the conduit. Alonzo then told Sandoval to go work on a different floor; when Sandoval left, the scaffold was no longer over the conduit. The accident occurred sometime after Sandoval left.

¶ 32    Alliance's foreman Alonzo[2] testified that he first observed the conduit in the conference room about one week before the accident. There was no safety cone over it, so he found a safety cone and placed it over the conduit because "we were going to be having to go in there in the next day or so." He believed that the cone was still there the day before the accident. Plaintiff or Sandoval, or both, complained to him about the conference room because of all the

_____
[2]John Alonzo's deposition was not included in the lower court record in its entirety.

materials in the room on the day before the accident and the day of the accident. The room contained boxes, cinderblock, and woodworking materials. He, Sandoval, and plaintiff had to move the materials out of the way. He testified that he did not "know if I specifically gave them instructions to do it or not, but *** it would have been implied. But, yes, they were–they had to work in that room, so, yes, they had to clear out the area." He indicated that the condition of the conference room was "inconvenient but it wasn't unworkable." Alonzo testified that none of the materials were blocking, hiding, or obstructing access to the electrical conduit protrusion.

¶ 33 According to Alonzo, on the day of the accident, he passed by the conference room at 5:50 a.m. and observed no cone over the conduit. He observed the conduit again shortly after 6 a.m. when Alliance had its morning meeting. "Miguel [Sandoval] and I were standing in the room. I don't remember if Roger [Lederer] was there or not. But since I–the cone was not there and I looked around, I did not see the cone anywhere, I told Miguel to be careful of the conduit when they were working in there." He instructed plaintiff and Sandoval to work in that room that day, but did not specify whether to use scaffolds or stilts. He did not instruct them to protect the conduit because "as soon as I left that room, I went to find either a–either ECI [Executive] or Midwest to b*** about what–about removal of the cone and/or not having something there." However, while on his way to alert someone from Executive or Midwest, Alonzo "ran into my supervisor [John Becker], b*** at him, and we were both on our way to go find somebody when the accident occurred." Alonzo was not present when plaintiff's accident occurred.

¶ 34 Alonzo testified that he had previously spoken with Urso, who "kept telling me to get in that room and tape it, and I told him when he cleared out his unneeded or unused materials out of this room that we would go in there and work." He testified that he spoke to Urso at "the Monday job meeting prior to that week and then the job meeting" of the week of the accident.

¶ 35 Alliance's superintendent of the project, Ferrarini, testified that it was his responsibility to regularly inspect the jobsite, coordinate Alliance's work with other contractors, ensure Alliance completed the scope of work, and ensure Alliance employees complied with Alliance's safety manual. He never saw Executive's safety manual. He testified that Alliance conducted weekly "toolbox talks," Alonzo instructed Alliance employees at the beginning of every workday, and Alliance was responsible to take precautions for its workers' safety, post warning signs and protect unsafe areas of its own work, and notify someone of a dangerous condition if created by another contractor. Ferrarini indicated that Alliance and its employees had the expertise to perform the drywall work and use the required tools, they did not need instructions, and no one from Executive instructed him how to perform the work. Stilts were commonly used on construction projects and no one from Executive indicated that they were not permitted.

¶ 36 Ferrarini did not believe that Alliance provided stilts, but workers brought their own, and Alliance supplied scaffolds, ladders, and roll-and-folds at the project. He indicated that it was "up to the taper" whether to use stilts or a scaffold. He affirmed that if an Alliance employee observed an unguarded conduit protruding from the floor, the employee should not use stilts until the condition was remedied. He had the authority to stop the employee and remedy the issue.

¶ 37 The day before the accident, Ferrarini did not recall observing any unkempt conditions in the conference room. He also did not observe an orange cone in the room.

¶ 38    The day of the accident, Ferrarini was near the area outside the conference room doing a walk-through approximately five to ten minutes before the accident occurred. Plaintiff was working on stilts and taping ceilings in the area adjacent to the conference room. Ferrarini saw the electrical conduit protruding from the floor in the conference room that day. He believed he mentioned something to plaintiff and said "[t]here was something coming out of the floor, for him to look out for it if he was going in there." Plaintiff responded, "okay."

¶ 39    Ferrarini testified that he was "on his way" to tell electricians about the exposed conduit, but he "didn't see anyone at the time before [the accident] happened." He heard a "big boom" and then entered the conference room to find plaintiff lying on some boxes. Ferrarini unstrapped plaintiff's stilts. Plaintiff told Ferrarini that he tripped on the electrical conduit that was protruding from the floor. Ferrarini observed a piece of conduit protruding about six inches up from the floor in the middle of the room. It was about six feet from boxes that were stacked along one wall. There were also two dumpsters and a stack of cinderblocks against another wall, and a scaffold in the room. The lighting conditions in the room were "fair" as there was temporary lighting in the room and the hallway. Nothing obstructed Ferrarini's view of the conduit. Ferrarini testified that either he or Alonzo reported the accident to Executive.

¶ 40    The superintendent for Midwest, John Shannon, testified that Midwest was responsible for completing all electrical construction for the project, including installation of the electrical conduit in the floors, and it did not need instructions in how to perform work. Midwest customarily placed safety cones over protruding conduit. Had he observed an unguarded conduit during his daily walk-throughs of the project, he would have "flagged that right away."

¶ 41                                    C. Circuit Court Decision

¶ 42    The circuit court granted summary judgment in favor of Executive, holding that Executive did not owe a duty of care to plaintiff and was not vicariously or directly liable under section 414 of the Restatement (Second) of Torts. The circuit court reasoned that the evidence showed that Executive only had a general right to order work stopped, to inspect its progress, and to make suggestions, and retained no control over the operative details or methods of the work of plaintiff or Alliance, which was insufficient to impose liability under section 414. The court also held that the evidence failed to show that Executive had notice of the alleged dangerous conditions (the use of stilts and/or the unprotected conduit). Thus, plaintiff failed to raise a genuine issue of fact as to control or notice.

¶ 43    Plaintiff moved for reconsideration. The circuit court denied the motion, finding that plaintiff was merely reasserting his previous arguments. This appeal followed.

¶ 44                                    II. ANALYSIS
¶ 45                                  A. Standard of Review

¶ 46    "[S]ummary judgment is proper only where the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49 (citing 735 ILCS 5/2-1005(c) (West 2000)). The court strictly construes the pleadings, depositions, admissions, and affidavits against the movant and liberally in favor of the opponent. *Id.* We review the circuit court's decision *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). In reviewing a

circuit court's decision on a motion for reconsideration, we employ an abuse of discretion standard, unless the motion only asked the circuit court to reexamine its application of the law to the particular case as it existed at the time of judgment, in which case the standard of review is *de novo*. *Belluomini v. Zaryczny*, 2014 IL App (1st) 122664, ¶ 20.

¶ 47                                  B. Section 414 of the Restatement (Second) of Torts

¶ 48     Plaintiff's personal injury claim is based in negligence, which requires plaintiff to prove "the existence of a duty owed by the defendant to the plaintiff, the breach of that duty, and the injury proximately caused by that breach." *Cochran v. George Sollitt Construction Co.*, 358 Ill. App. 3d 865, 873 (2005). "Whether a duty exists is a question of law to be determined by the court." *Ross v. Dae Julie, Inc.*, 341 Ill. App. 3d 1065, 1069 (2003).

¶ 49     Although a general contractor is usually not liable for the negligence of an independent contractor that it employs (*Joyce v. Mastri*, 371 Ill. App. 3d 64, 73 (2007)), section 414 of the Restatement (Second) of Torts has carved out a "retained control" exception which "provides for both vicarious and direct liability, depending on the degree of control that the defendant retains over its independent contractor." *Madden v. F.H. Paschen/S.N. Nielson, Inc.*, 395 Ill. App. 3d 362, 380-81 (2009) (citing Restatement (Second) of Torts § 414, at 387 (1965)). Section 414 provides:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965).

¶ 50     The comments following this section further clarify the distinction between vicarious and direct liability. *Maggi v. RAS Development, Inc.*, 2011 IL App (1st) 091955, ¶ 44. As explained in comment *a*:

> "If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." Restatement (Second) of Torts § 414 cmt. a (1965).

¶ 51     Thus, a general contractor may be held vicariously liable for a subcontractor's negligence "under the principles of agency where the employer retains control over the operative detail of any part of the contractor's work." *Martens v. MCL Construction Corp.*, 347 Ill. App. 3d 303, 314 (2004). Alternatively, it may be found directly liable "[i]f the employer retains only supervisory control, *i.e.*, power to direct the order in which work is done, or to forbid its being done in a dangerous manner, *** unless he exercised supervisory control with reasonable care." *Id.* at 314. Comment *b* further explains the concept of direct liability:

"The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself. So too, he is subject to liability if he knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so." Restatement (Second) of Torts § 414 cmt. b (1965).

¶ 52     However, comment *c* provides that a general contractor is not liable where:

"he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414 cmt. c (1965).

¶ 53     By way of example, in *Martens*, the court affirmed summary judgment for the defendant construction manager because the contract's reservation of a general right of control was insufficient, standing alone, to subject the general contractor to liability. *Martens*, 347 Ill. App. 3d at 316. The contract between the owner and the defendant gave the latter control over the construction means, methods, and coordination of the work, and the defendant was responsible for initiating and maintaining a safety program, which included appointing a safety director, maintaining safeguards, and citing subcontractors for violations. *Id.* at 307. However, the sub-subcontractor maintained control over the steel erection work and safety of its workers, and its safety manual indicated that the sub-subcontractor's foreman was responsible for enforcing the safety rules. *Id.* at 316. The plaintiff, an ironworker employed by the sub-subcontractor, was injured after falling from a steel beam. *Id.* at 306, 320.

¶ 54     The *Martens* court held that the defendant did not have control over the sub-subcontractor's method of operation because the parties had agreed that the sub-subcontractor would not comply with the defendant's general tie-off safety rule, and instead would follow a different rule and retain the authority to order when its workers would tie off. *Id.* at 318. Further, the defendant did not maintain an extensive work site presence and neither its safety director nor its project manager had the right to stop unsafe work or instruct or supervise the sub-subcontractors' workers. *Id.* at 317. No one from the defendant company was present when the accident occurred, whereas the sub-subcontractor's foremen were present and supervising the work. *Id.* at 317-18. Thus, the *Martens* court held that the sub-subcontractor was free to perform the work its own way and only the sub-subcontractor exercised control over the plaintiff's work. *Id.* at 319. See also *Cochran*, 358 Ill. App. 3d at 868-80 (finding no genuine issue of material fact as to liability where the general contractor was contractually responsible for construction methods and creating and implementing a safety program, its superintendent coordinated the subcontractors' work and had the right to

halt unsafe work and have it corrected, but otherwise did not actively inspect for safety violations or control the operative details of the subcontractor's work, and the unsafe condition was created by the subcontractor, was in a remote location of the jobsite, was not viewed by the general contractor, and it existed only for a short time before the accident); *Diaz v. Legat Architects, Inc.*, 397 Ill. App. 3d 13, 34-35 (2009) (holding that the general contractor could be directly liable because it retained sufficient control over the project's safety where it was contractually responsible for safety, for designating a competent superintendent and a person responsible for preventing accidents, for construction methods and procedures, and for coordinating the work. Also, the subcontractor was required to follow the general contractor's safety directions, the general contractor had the authority to stop unsafe work and have the problem remedied.).

¶ 55    Turning to the facts of the case at bar, we disagree with the circuit court's conclusion that Executive did not retain sufficient control to be held liable under section 414. We hold that there was sufficient evidence based on the undisputed facts for the circuit court to find as a matter of law that Executive had more than merely a general right of supervision, and was therefore potentially subject to liability under section 414.

¶ 56    A general contractor may retain control over the independent contractor's work by contract, "supervisory, operational, or some mix thereof. *** A party who retains some control over the safety of the work has a duty to exercise that control with ordinary care." *Martens*, 347 Ill. App. 3d at 318. Thus, we first examine the relevant contracts involved. " '[T]he best indicator of whether a contractor has retained control over the subcontractor's work is the parties' contract, if one exists.' " *Calderon v. Residential Homes of America, Inc.*, 381 Ill. App. 3d 333, 343 (2008) (quoting *Joyce*, 371 Ill. App. 3d at 74). In terms of contractual control, the subcontracts between Alliance and Executive, and Midwest and Executive, required the subcontractors to "report promptly any such improper conditions and defects to ECI in writing." They were obligated to perform the work in accordance with Executive's safety program and attend weekly coordination meetings. The rules and regulations attached to the contracts required Executive to create and implement a safety program, required all subcontractors to adhere to it, and required Executive to appoint a project superintendent who was responsible for implementing and enforcing the program. Subcontractors were required to have a safety representative to ensure compliance and train employees, and also hold weekly "tool box" meetings. All project employees were required to advise supervisors or a safety representative of any hazards or dangerous conditions.

¶ 57    As further evidence of Executive's involvement, its own safety manual provided that the supervisor and management were required to follow all safety rules, inspect the jobsite regularly for unsafe conditions, and warn subcontractor employees of a dangerous situation. Significantly, the manual *specifically prohibited the use of stilts by Executive or subcontractor employees*. Although "[t]he mere existence of a safety program, safety manual, or safety director is insufficient," standing alone, to impose liability under the "retained control" exception (*Madden*, 395 Ill. App. 3d at 382), the manual demonstrates that Executive specifically prohibited one means or method of performing the work. A general contractor "need only retain control over any part of the work in order to be subject to liability for a failure to exercise his control with reasonable care." *Diaz*, 397 Ill. App. 3d at 34. Moreover, "[t]he power to forbid work from being done in a manner likely to be dangerous to himself or others is given as an illustration of the type of power retained by an employer which could subject

him to liability." (Internal quotation marks omitted.) *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 1063-64 (2000).

¶ 58 Additionally, other indicia of control are present in this case. Besides Executive's contractual responsibility to create and implement a safety program and require the subcontractors' compliance, Executive also retained the authority to stop unsafe work and order it remedied. Urso testified that he had the authority to stop unsafe work if he felt there was an immediate threat to safety. In addition to managing the overall coordination of the work, Urso was responsible for ensuring that the subcontractors complied with Executive's safety policies. He had the authority to follow up with a subcontractor if he observed any safety hazards and bring it into compliance. He maintained a strong worksite presence and conducted weekly safety inspections of the jobsite. Further, during Executive's weekly coordination meetings, Urso discussed safety topics and reiterated that the subcontractors were to abide by Executive's safety policies. Executive also had a safety coordinator who visited the jobsite occasionally. We also note that, according to Urso, Executive's own laborers had the authority to cover an unguarded conduit if they saw one. Further, we find it significant that, immediately before the accident, Alliance's foreman, Alonzo, was "on his way" to inform someone from Executive of the unprotected conduit when the accident happened. That Alonzo looked to Executive to remedy the safety hazard is further demonstration of the level of supervisory control which Executive retained over the jobsite. And, according to Urso (and despite the fact that Executive's safety manual already indicated that the use of stilts was not permitted), Executive began prohibiting the use of stilts sometime after the accident occurred.[3]

¶ 59 Analogizing our case to *Martens* helps illustrate why we find that Executive had sufficient control to be subject to liability under section 414. In contrast to *Martens*, where the sub-subcontractor obtained a specific exception to the defendant's general tie-off rule, Alliance was not entirely free to perform the work its own way. Alliance agreed to be bound by Executive's safety policies and the parties did not contractually agree that Alliance would be exempt from a specific policy (such as the prohibition on using stilts). The parties here did not agree that Alliance would follow its own rule instead, or would retain sole control over a specific safety issue. Also, Executive maintained a larger jobsite presence than the defendant in *Martens*, which included regular inspections for safety hazards and weekly meetings where safety issues were addressed. Further, unlike in *Martens*, Executive had the right to stop unsafe work if there was an immediate threat to safety, or otherwise notify the subcontractor of a hazard and bring it into compliance with its safety manual. And as noted, the Alliance foreman was on his way to inform Executive about the unguarded conduit when the accident occurred.

¶ 60 In sum, we find that plaintiff presented sufficient undisputed evidence to establish as a matter of law that Executive retained sufficient supervisory control such that it had a duty to exercise this control with reasonable care, and it could therefore be held liable pursuant to section 414.

¶ 61 Plaintiff also contends on appeal that the circuit court erred in concluding that Executive lacked notice of the unsafe conditions.

---

[3]While this evidence would probably be considered to be a subsequent remedial measure, an exception to that evidentiary bar is found when it is offered to show control. See *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 323-24 (1965); *Maggi v. RAS Development, Inc.*, 2011 IL App (1st) 091955, ¶ 72.

¶ 62    As previously set forth, comment *b* to section 414 provides that a general contractor is liable if "he knows or by the exercise of reasonable care should know" that the subcontractors are performing their work in an unreasonably dangerous way and he has the opportunity to prevent it, or if he "knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care" in remedying it or having the subcontractor remedy it. Restatement (Second) of Torts § 414 cmt. b (1965). As such, "the general contractor's knowledge, actual or constructive, of the unsafe work methods or a dangerous condition is a precondition to direct liability." *Cochran*, 358 Ill. App. 3d at 879-80.

¶ 63    In *Cochran*, for example, the court found that the general contractor did not have notice of an unsafe ladder setup as it existed only for an hour before the accident, it was located in a remote area of the jobsite, and none of the general contractor's "competent persons" had observed it during that time period. *Cochran*, 358 Ill. App. 3d at 880. On the other hand, in *Diaz*, the court held that the plaintiff established a *prima facie* case as to notice of a dangerous condition where the prime contractor's superintendent inspected the scaffold twice on the day of the accident, but lacked the training and experience to recognize a problem with the scaffold, and the prime contractor was contractually obligated to furnish a "competent superintendent." *Diaz*, 397 Ill. App. 3d at 35-36.

¶ 64    In the present case, we conclude that plaintiff provided sufficient evidence to establish as a matter of law that Executive knew or should have known of the dangerous conditions. Unlike in *Cochran*, and contrary to Executive's assertion, the evidence indicated that the alleged conditions (the unprotected conduit and general congestion or clutter in the area) existed for longer than an hour. According to plaintiff, it was the presence of not only the unguarded electrical conduit, but also the general congestion and clutter of the space and the lack of lighting that contributed to his accident. According to plaintiff's deposition testimony, the congested conditions existed the day before and the day of the accident. Further, plaintiff complained to Urso about the conditions the day before the accident. Urso noted that there were construction materials in the vicinity, but apparently took no further action. Sandoval indicated that the conduit was unguarded as he and plaintiff were cleaning the conference room before doing drywall work on the morning of the accident, and then they worked on the drywall for about one hour before Sandoval moved to a different floor. Plaintiff testified that he worked for about two or three hours before the accident happened. According to Alonzo, the conduit did not have a cone over it as of 5:50 a.m. on the day of the accident. Alonzo's testimony also shows that Urso was made aware of the congested condition of the conference room a week or two before the accident when Urso urged Alliance to complete the drywall work in that room but Alonzo told him that they would not complete the work until the room was cleaned out.

¶ 65    In further distinction from the circumstances in *Cochran*, the dangerous conditions here were not located in a remote location of the building that was unfrequented by others. Rather, it was in a highly trafficked, visible area of the jobsite because the conference room was located near the freight elevator. Although Executive contends that plaintiff's comment to Urso referred only to the area near the freight elevator, the evidence, including Urso's testimony, reflects that the conference room was located directly off the freight elevator entrance and was missing one wall, so one could see into the room without having to enter it. Additionally, unlike in *Diaz*, where the supervisor was not knowledgeable about scaffolds, Urso possessed

the knowledge that the accumulation of debris or an unguarded conduit protruding from the floor could constitute potential safety hazards.

¶ 66                                    III. CONCLUSION

¶ 67        For the reasons stated above, we reverse the circuit court's order granting defendant's motion for summary judgment, and remand to the circuit court for further proceedings consistent with this opinion.

¶ 68        Reversed and remanded.