# Illinois Official Reports

## Appellate Court

---

### *Foley v. Builtech Construction, Inc.*, 2019 IL App (1st) 180941

---

| | |
|---|---|
| Appellate Court Caption | JOHN FOLEY, Plaintiff-Appellant, v. BUILTECH CONSTRUCTION, INC., Defendant-Appellee. |
| District & No. | First District, Second Division<br>No. 1-18-0941 |
| Filed | July 23, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-L-2809; the Hon. Kathy M. Flanagan, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Steven A. Berman, of Anesi, Ozmon, Rodin, Novak & Kohen, Ltd., of Chicago, for appellant.<br><br>Dustin J. Karrison, of Purcell & Wardrove, Chtrd., of Chicago, for appellee. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justice Pucinski concurred in the judgment and opinion.<br>Justice Mason dissented, with opinion. |

**OPINION**

¶ 1    An employee of a subcontractor was injured while moving rebar used for concrete installation. He sued the general contractor, Builtech Construction, Inc. (Builtech), for negligence. After discovery closed, Builtech moved for summary judgment, arguing it had neither actual nor constructive notice of any dangerous condition at the jobsite. The trial court granted summary judgment. We reverse and remand for further proceedings.

¶ 2    We hold that the issue of whether Builtech retained sufficient control over the subcontractor's work to trigger liability for its employee's injury presents a question of fact, precluding summary judgment. Builtech had a project superintendent who inspected the jobsite daily, its own safety measures in place, a safety manual, ongoing training, and a safety supervisor monitoring safety at the worksite who was authorized to halt the subcontractor's unsafe work practices. Builtech also employed an outside safety auditor who worked closely with the safety supervisor. The contract between Builtech and the subcontractor required the subcontractor to comply with Builtech's own safety rules. Because a material question of fact arises regarding the issue of compliance with Builtech's own safety rules, summary judgment is inappropriate.

¶ 3                                                Background
¶ 4                                     *Second Amended Complaint*
¶ 5    While attempting to retrieve buried rebar on the jobsite, John Foley was injured. Foley's second amended complaint alleged construction negligence in that Builtech had the authority to stop the work, refuse the work and materials, "and/or order changes in the work, in the event the work was being performed in a dangerous manner or for any other reason." Foley also alleged that Builtech had a duty to exercise reasonable care at the site, including providing proper and safe placement of the rebar, and failed to (i) provide a safe workplace, (ii) inspect and supervise the work, (iii) warn of dangerous conditions, and (iv) provide adequate space to store the rebar.

¶ 6    A second count, "Premises Liability," alleged Builtech had a duty to maintain the jobsite and through its negligence caused the premises "to become and remain in a dangerous condition." Builtech "improperly operated, managed, maintained, and controlled" the worksite; failed to properly move the rebar, allowing it to be moved and buried; failed to reasonably inspect and warn Foley of the dangerous condition; and failed to provide space to adequately store the rebar.

¶ 7                                           *Depositions*
¶ 8    Builtech retained two subcontractors, Chicago Town Construction (Chicago Town) and Precision Excavation, Inc. (Precision), to do the foundation work. Precision would excavate the site, while Chicago Town was to perform concrete services for the building's foundation. The concrete structures were reinforced with steel rebar; Chicago Town's work included placing rebar into the forms, pouring concrete into the forms, and then stripping the forms. The rebar was stacked on-site.

¶ 9                                          *Bob Bokar*

¶ 10        Builtech's superintendent for the project, Bob Bokar, had a storefront office across from the jobsite. Bokar supervised all the subcontractors on the jobsite and was part of the safety department. Eliminating jobsite hazards was part of Bokar's duties. Bokar, on a daily basis, inspected the workplace, arriving at the jobsite around 6 a.m. Builtech had the authority to direct people how to properly lift heavy items on the jobsite. Part of Bokar's job was to stop a worker from improperly lifting a heavy item. If Bokar determined a subcontractor's "means and methods" were unsafe, he had the authority to stop the subcontractor and direct safety or work method changes. Chicago Town employees were required to comply with all decisions made by Builtech regarding safety requirements.

¶ 11        Builtech had an auditor who would periodically inspect the jobsite to identify unsafe conditions or work methods and then notify Bokar of any concerns. John Ribskis, Builtech's safety supervisor, accompanied the auditor and possessed the authority to require workers to change unsafe work means and methods.

¶ 12        Builtech's safety manual required subcontractors to comply with its "means and methods" provisions, including lifting and material handling. Builtech held weekly meetings for its subcontractors on various safety topics.

¶ 13        Bokar took photographs of the jobsite, "usually daily." During the deposition he testified about photographs taken on May 11 and May 15. Bokar stated he did not take photographs to try to document where the incident occurred.

¶ 14        Chicago Town ordered the rebar for the concrete work and scheduled delivery. Chicago Town workers unloaded the rebar, but Bokar controlled its storage on-site. Further, if Chicago Town wanted to store the rebar in a location or manner that could have been hazardous to workers, Bokar would "not allow that" and had authority to tell Chicago Town to "re-store or re-organize their rebar."

¶ 15        Bokar approved certain areas to store the rebar, which required communication with Chicago Town. The standing agreement for subcontractor work included as a general condition of all work performed: "the subcontractor shall store its materials within the locations as approved by the contract." In Bokar's experience this was a "smaller" jobsite with limited space. The project was small enough not to need assistant superintendents.

¶ 16        When Foley's counsel asked Bokar about Builtech's safety rules, "hypothetically, if Chicago Town argued with you, *** your direction would trump Chicago Town's?" Bokar answered, "[a]bsolutely." Bokar stated he had authority to inspect the rebar at any time. If he inspected and found the rebar "tangled up," he would have told Chicago Town. The excavating company brought sand in a dump truck to use as backfill. If the excavators left dirt or "spoils" (mounds of dirt) on the site, he would have required them to clean it up as improper and potentially unsafe.

¶ 17        The rebar was delivered to the jobsite on May 1, 2015. Two Chicago Town employees, Ismael Ramirez, a carpenter, and Juan Alfaro, a laborer, and others moved the rebar from the delivery spot to a spot closer to the building. They tried to stack the rebar so that it would not tangle.

¶ 18        Bokar did not see Foley lifting rebar on May 21, nor did he see Foley hurt himself. Foley told Bokar he "twinged" his back. Bokar had him fill out an incident report form.

## Michael Chapman Deposition

Michael Chapman, the owner and president of Chicago Town, testified that he decided where to store the rebar on the jobsite but Bokar had the authority to tell Chapman to move the rebar or to stop work if necessary. Sometime between May 4 and May 15, Ramirez, Alfaro, and another carpenter moved and restacked the rebar.

## Jonathan Ribskis Deposition

Jonathan Ribskis, who had been Builtech's project manager/safety coordinator, testified remotely from North Carolina. For this project Ribskis acted as the safety coordinator, generally responsible for safety on the jobsite. He conducted occasional safety audits on-site, inspecting the subcontractors' work methods and making recommendations. Bokar was on the jobsite on a daily basis; a project manager was not on-site daily but "no less than every other week." One of Bokar's duties was to determine safety concerns. The project manager had the authority to stop a subcontractor performing unsafe work or to change the means or method of lifting.

The means and methods of work were each subcontractor's responsibility. The general contractor was responsible for coordinating the work between the subcontractors and for alerting the subcontractors about unsafe storage. Builtech had the authority to instruct Chicago Town to restack or move the rebar if it believed Chicago Town had stacked the rebar in an unsafe manner or location.

Builtech had a safety manual, an "Injury & Illness Prevention Program," and weekly safety meetings at the jobsites.

A safety inspector hired by Builtech for a safety program prepared a report for Builtech, "Construction Hazard Identification and Risk Assessment 2015." Section 13, labeled "Ergonomics," addressed "identification and assessment of hazardous manual tasks:" If Builtech saw a subcontractor lifting with poor or dangerous form, it had the authority to stop him. Another section, "Lifting and Material Handling," contained bullet points on safe lifting.

Before Foley's accident, Ribskis was unaware of any complaints about where or how safely the rebar was stacked. Ribskis stated "at that time it was an average size project."

Ribskis identified four color photographs that, according to the Chicago Town attorney, were taken "sometime in May of 2015." The undated photographs show four views of the rebar in various piles next to a brick wall. Ribskis did not think the way the rebar was stacked in any of the photographs was a "deviation of the safety standard."

## Patrick Burns Deposition

Patrick Burns was the estimator/project manager for Precision. Precision's contract with Builtech required compliance with all safety rules and regulations and to keep daily work reports. Precision would dig according to the blueprints, and then the concrete company would come in to pour footings. Burns agreed that the photographs showed mounds of dirt. Burns stated the jobsite was small and without room to "spread out." He heard one of the ironworkers complain that it was not easy to walk around because of the small jobsite, excavations, and rebar "all over." On this job, Precision did not create any mound of dirt that could have inadvertently covered any materials nearby. Precision did not move any of the piles of rebar.

*Ismael Ramirez and Juan Alfaro*

Ramirez and Alfaro each testified through a Spanish interpreter. Ramirez was a union carpenter working for Chicago Town for 30 years, the last 12 years as a foreman. Ramirez went through Occupational Safety and Health Administration (OSHA) safety training. Whenever Chicago Town started a new job, the superintendents for the general contractors held a safety orientation. In Ramirez's experience, the chain of command was Mike Chapman, Bob Bokar, and then Ramirez. Only ironworkers were permitted to handle the rebar.

Alfaro was a laborer with Chicago Town for five years. The carpenters and laborers from Chicago Town would not move the rebar pile unless the ironworkers or Chapman told them to do so. Alfaro was on-site and saw Foley on "six or eight" occasions around the time of the accident, which occurred somewhere in the middle of those days. The following exchange was had:

> "Q. Did you see Mr. Foley pulling rebar and hurting his back?
>
> A. I saw him pulling it, but I don't know if that's the moment when he injured himself.
>
> Q. Were you present—when you saw Mr. Foley pulling rebar, did you see him pulling it from a stack of rebar?
>
> A. Yes.
>
> Q. At the time you saw Mr. Foley pulling the rebar from the stack of rebar, was the stack organized in bundles of rebar that were tied together or was it all loose rebar?
>
> A. It was all tied together and it was in one place and it was all stacked on top of each other, but it was all organized in that one place.
>
> Q. When you say 'tied together,' did it have metal ties with—tying various, bundles of rebar?
>
> A. Yes. It's a wire—it's tied—held together by a wire and they all have a number, and that's the way that it's sent from the factory."

Alfaro was told to move the rebar; he asked Foley how they wanted it stacked. Ramirez told him what to do.

*John Foley Deposition*

As the general contractor, Builtech oversaw the whole project. If Bokar directed Foley to have the workers wear their safety vests or use rebar caps for safety, Foley had to comply. If Bokar had determined the rebar was tangled and Foley should not have worked on it until it was safe, Foley would have had to wait. If Foley had a safety concern and Chapman was not present, he would have told Bokar about his concern. Before Foley's injury, Bokar pointed out the lack of safety caps on the rebar and that one of the ironworkers was not wearing a safety vest.

Chicago Town ironworkers were not on the site when the rebar was delivered, and Foley did not know who decided where to put it. When Foley arrived on the morning of his injury, the rebar had been moved to a different spot from the last time he saw it, some 5 to 10 days before. The pile was a "tangled mess." Standard procedure would require tagging the rebar, separating it by size, and then stacking it on wooden four-by-fours. But the rebar was neither sorted nor stacked properly, and some of the tags were missing. Foley had to pull the rebar he needed out of the pile, as it was "hidden" under the pile. Foley explained the rebar was not

completely buried but there was "a fair amount" of dirt covering some of the pile. Under union rules, laborers were not allowed to handle the rebar, and Foley was not allowed to ask laborers for help in handling the rebar.

¶ 37 Foley opined that there was plenty of room to stack the rebar but the way it was moved "was like somebody was in a hurry." On that morning, Foley was told that Builtech and Chapman wanted to pour concrete by noon, so he "had to just work at it and get the rebar out." Foley had been working about 45 minutes before he injured himself.

¶ 38 *Photographs*

¶ 39 Included in the record were several exhibits comprising photographs of the jobsite from different angles and on different days. While most of the photographs are in black and white, four color photographs depict the rebar stack identified by Ribskis. Only the color photographs elucidate the assembly of the rebar stack, but the dates the photographs were taken are unclear.

¶ 40 *Contract Between Builtech and Chicago Town*

¶ 41 The first paragraph, "Scope of Work," of Builtech's contract with Foley's employer, subcontractor Chicago Town, specified Chicago Town would "furnish all labor, material, service and equipment." Chicago Town also "assume[d] all duties, obligations, liabilities and responsibilities" related to its work that Builtech assumed via its contract with the "Owner."

¶ 42 Paragraph 12 ("Insurance Requirements and Indemnification") states that Chicago Town "shall *** indemnify and save harmless" Builtech, the "Owner," and the architect for any liability for injuries to Chicago Town or its employees resulting from negligence.

¶ 43 Regarding safety, paragraph 18 ("Safety") provides Chicago Town "shall at all times comply with all safety rules, regulations, and requirements" of "applicable codes, ordinances, and specifications." Paragraph 18 also provides Chicago Town would be responsible for damages that occurred as a result of its fault or negligence and would "protect the materials and work from deterioration and damage during construction." Further, paragraph 18 states that "[n]othing contained herein shall be construed as imposing liability on [Builtech] or Owner" for Chicago Town's obligation to ensure safety at the jobsite. Another provision requires Chicago Town to "comply with all decisions of the Contractor or Owner relative to safety requirements" and that Chicago Town "shall be liable for maintaining strict adherence to all safety regulations, including full-time maintenance of fully adequate safety standards to protect the general public, work force and any and all parties."

¶ 44 Paragraph 18 adds: "In order to provide safety controls to protect the life and health of employees and other persons, to prevent damage to property, materials, supplies and equipment ***, [Chicago Town] will take *** such additional measures as [Builtech] may determine to be reasonably necessary for the purpose." Additionally, "[n]othing contained herein shall be construed as imposing liability on [Builtech] or Owner for the obligation of Chicago Town to take all measures necessary to ensure the safety of its employees, agents and other persons at the job site for matters related to the work contemplated."

¶ 45 Regarding deliveries of equipment or material, paragraph 25 ("Deliveries of Equipment or Material") makes Chicago Town responsible for the "handling, unloading and safe storage" of material delivered to the project site. Builtech "may cooperate with the unloading of said

materials" but would not be responsible for any shortage and would be paid for its services.

¶ 46                                    *Summary Judgment*

¶ 47    The trial court found the contract between Chicago Town and Builtech did not indicate control over incidental aspects of the work or the safety of the project. According to the trial court, the responsibility for the delivery, handling, unloading, and storage of the rebar was Chicago Town's, not Builtech's. The trial court cited comment c to section 414 of the Restatement (Second) of Torts, that "[t]here must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414 cmt. c (1965). The trial court also cited *Maggi v. RAS Development, Inc.*, 2011 IL App (1st) 091955, ¶ 44.

¶ 48    Additionally, the trial court found no evidence that Builtech had actual or constructive notice of any dangerous condition regarding the pile of rebar, specifically that there was tangled rebar hidden under the pile.

¶ 49                                       Analysis

¶ 50    The purpose of summary judgment is not to try a question of fact but to determine the existence of any genuine issue of fact. *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005). Summary judgment is appropriate where the pleadings, depositions, and admissions on file, as well as any affidavits and exhibits, when viewed in the light most favorable to the nonmoving party, demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2014); *Pestka v. Town of Fort Sheridan Co.*, 371 Ill. App. 3d 286, 299 (2007) (citing *Martens v. MCL Construction Corp.*, 347 Ill. App. 3d 303, 312 (2004)).

¶ 51    To survive summary judgment, the nonmoving party does not have to prove his or her case but must present some factual basis that arguably entitles the party to a judgment. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). The court may draw inferences from undisputed facts; however, if reasonable persons could draw divergent inferences from those facts, the motion for summary judgment should be denied, and the trier of fact should decide the issue. *Martinez v. Mobil Oil Corp.*, 296 Ill. App. 3d 607, 611 (1998). "Although the use of a summary judgment procedure is encouraged as an aid in expeditious disposition of a lawsuit, it is a drastic means of disposing of litigation and should only be allowed when the right of the moving party is clear and free from doubt." *Id.*

¶ 52    We review a grant or denial of summary judgment *de novo. Weather-Tite, Inc. v. University of St. Francis*, 233 Ill. 2d 385, 389 (2009).

¶ 53                                       *Control*

¶ 54    Foley asserts the record contains substantial evidence that the general contractor, Builtech, retained contractual control over the work of the subcontractor, Chicago Town, and negligently failed to exercise its control by allowing unsafe material storage and handling to occur.

¶ 55    The party in control is the proper party to be charged with the responsibility of preventing negligent performance. *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 32. *Carney* addressed the issue of the existence of a duty on the part of one who hires a subcontractor in the context of a construction-related injury and expressly adopted section 414 of the

Restatement (Second) of Torts for negligence cases involving construction-related injuries. *Id.* ¶¶ 33-36. To state a claim for negligence under section 414, the plaintiff must allege that the defendant owed him a duty, that the defendant breached that duty, and that plaintiff's injury was proximately caused by the breach. *Id.* Whether the duty exists is a question of law and turns on whether the defendant controls the work in such a manner that he should be held liable. *Martens*, 347 Ill. App. 3d at 315.

¶ 56    Section 414 states: "One who entrusts work to an independent contractor, *but who retains the control of any part of the work*, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." (Emphasis added.) Restatement (Second) of Torts § 414 (1965). Comment c to section 414 of the Restatement states "There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." *Id.* § 414 cmt. c.

¶ 57    "The best indicator of whether a defendant retained control sufficient to trigger the potential for liability under section 414 is the written agreement between the defendant and the contractor." *Carney*, 2016 IL 118984, ¶ 41. But even if the agreement provides no evidence the defendant retained control, evidence of the defendant's conduct at variance with the agreement may still demonstrate that control. *Id.* For example, " '[a] general contractor may retain control over the independent contractor's work by contract, 'supervisory, operational, or some mix thereof.' " *Lederer v. Executive Construction, Inc.*, 2014 IL App (1st) 123170, ¶ 56 (quoting *Martens*, 347 Ill. App. 3d at 318). A party retaining some control over the safety of the work then has a duty to exercise its control with ordinary care. *Id.*

¶ 58    In construction negligence cases, the trier of fact determines the extent of supervision of a contractor's control over a subcontractor's work. *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051 (2000). In *Bokodi*, the subcontractor's employee sued the general contractor after suffering a back injury. *Id.* at 1057. This court held "[i]n a construction negligence action, the trier of fact must determine whether a contractor retained such control over the work of the subcontractors that the contractor was required to supervise and its failure to supervise in any of the ways ascribed in the complaint was a proximate cause of the injury." *Id.* at 1059.

¶ 59    Another case where this court concluded that whether a general contractor retained sufficient control to trigger section 414 liability presented a fact question is *Grillo v. Yeager Construction*, 387 Ill. App. 3d 577, 594 (2008). The contract between the contractor and the owner gave the contractor control of the operative details and safety at the construction site, specifying the contractor was solely "responsible for all safety precautions and programs." (Internal quotation marks omitted.) *Id.* Trial testimony established the contractor was on-site on a daily basis, inspecting the jobsite and actively supervising the subcontractors. *Id.* The plaintiff testified he would be told to stop what he was doing and to start something else. *Id.* This court held there was sufficient evidence of retained control to present a question of fact for the jury to decide. *Id.* at 595. This court further held that, even if the defendant contractor did not exercise sufficient control to owe the plaintiff a duty under section 414 of the Restatement, the evidence showed the contractor, as possessor of the land, owed the plaintiff a duty under section 343 of the Restatement. *Id.*

¶ 60    The contract between Builtech and Chicago Town gave Builtech the power to stop the work of Chicago Town's employees. Bokar testified that, in any disagreement about safety rules, his direction would "absolutely" overrule Chicago Town's. Bokar controlled the rebar

storage on the jobsite. According to Bokar, he had authority to inspect the rebar at any time and if he found the rebar "tangled up" he would have told Chicago Town. He also would not have allowed Chicago Town to store materials in an unsafe location or manner and would have required the excavating company to clean up any dirt or "spoils" that were improper and potentially unsafe.

¶ 61    Builtech relies on *Carney*, 2016 IL 118984, arguing the contract made Chicago Town solely responsible for its own work and jobsite materials. In *Carney*, a subcontractor's employee/son sued the owner railroad that hired the contractor. *Id.* ¶ 5. The owner railroad invited a scrap contractor to bid on a bridge demolition, and the scrap contractor, in turn, contacted Carney Group, Inc. (Carney), with which it had a 20-year business relationship. *Id.* Carney's president attended the prebid meeting on a "handshake agreement." *Id.* When the railroad accepted the bid, the railroad and the contractor entered into a "Purchase and Removal Agreement" whereby the contractor would purchase the bridge and provide all the labor, tools, and material necessary to remove the bridge. *Id.* ¶ 6. The railroad was unaware of any agreement between the contractor and Carney. *Id.* The son of Carney's president was injured after being called in to help with a bridge demolition. *Id.* ¶ 8. His complaint against the defendant railroad alleged negligence in failing to discover and disclose to either the contractor or the plaintiff the presence of a dangerous condition. *Id.* ¶ 10. The complaint further alleged the railroad retained control over the work and safety of the demolition project but negligently failed to develop a plan and supervise the work. *Id.* The Illinois Supreme Court found no evidence that the railroad retained at least some degree of control over how the independent contractor performed the demolition work. *Id.* ¶ 91.

¶ 62    *Carney*, however, confined its analysis to whether the railroad retained control over the work of its contractor "such that direct liability might attach under section 414 [of the Restatement]." *Id.* ¶ 40. "The issue of a defendant's retained control may be decided as a matter of law where the evidence is insufficient to create a factual question." *Id.* ¶ 41.

¶ 63    In contrast to the facts in *Carney*, here the witnesses' testimony was not unequivocal regarding the amount of control Builtech had over the project but, rather, presents a genuine issue of material fact. Builtech's safety manager, Ribskis, testified that Builtech as the general contractor retained responsibility for ensuring the jobsite workers' safety and, further, that everyone from Builtech was responsible for safety "even if it's not their daily responsibility." Ribskis admitted that, if a subcontractor were performing work in an unsafe manner, Builtech would have the authority to stop the work. Additionally, under the contract Builtech had authority over Chicago Town's work; Builtech's safety manual contained requirements Chicago Town had to follow. "The party who retains control is the logical party upon whom to impose a duty to ensure worker safety. Penalizing a general contractor's efforts to promote safety and coordinate a general safety program among various independent contractors at a large jobsite hardly serves to advance the goal of work site safety." *Martens*, 347 Ill. App. 3d at 318.

¶ 64    Significantly, "the existence of a safety program, safety manual or safety director does not constitute retained control *per se*; the court must still conduct an analysis pursuant to the section 414 retained control exception." *Id.* In *Martens*, the subcontractor informed the contractor it could not comply with a particular rule and instead insisted on the OSHA standard for ironworkers, as incorporated into the contractor's safety manual. *Id.* But the subcontractor rejected the general contractor's suggestion regarding the rule and kept control of its own

- 9 -

methods. *Id.* Thus the contractor did not retain or exercise authority over the subcontractor's method of operation. See *Cochran v. George Sollitt Construction Co.*, 358 Ill. App. 3d 865, 878-79 (2005) (summary judgment affirmed where defendant did not (i) employ full-time safety manager, (ii) conduct safety meetings for subcontractors, (iii) require superintendent to do a daily "walk-through," (iv) get involved in specific details of subcontractors' safety means, (v) actively inspect for safety violations, or (vi) empower all employees to halt subcontractors' work on observing safety violations).

¶ 65        Indeed, only the party with retained control "over incidental aspects of the work" should be charged with the responsibility of preventing negligent performance. *Fonseca v. Clark Construction Group, LLC*, 2014 IL App (1st) 130308, ¶ 29. For example, in *Fonseca*, the defendant contractor did not have any control over the way the subcontractor did its work— the subcontractor's foreman directed and supervised the subcontractor's employees, the subcontractor was responsible for cleaning up its own debris, the contractor never stopped the subcontractor's work, and the subcontractor controlled *"the means and methods of its own work during construction of the building."* (Emphasis added.) *Id.* The language of the subcontract, the employees' depositions about the actual practice at the site, and the subcontractor's foreman's affidavit and testimony all indicated the defendant contractor did not retain sufficient control over the subcontractor's work to trigger section 414 of the Restatement (Second) of Torts. *Id.* ¶ 31. Thus, as a matter of law, the defendant did not owe a duty to exercise reasonable care, and the appellate court affirmed the grant of summary judgment. *Id.*

¶ 66        Nor did the general contractor retain sufficient control of the subcontractor's employee so as to impose liability in *Snow v. Power Construction Co.*, 2017 IL App (1st) 151226. There, the plaintiff was a surveyor for a subcontractor hired by the general contractor and was injured when he tried to move several sheets of leftover drywall that had been stacked by a different subcontractor. *Id.* ¶ 1. The evidence showed the custom and practice was that one subcontractor was not permitted to move the materials of another subcontractor. *Id.* ¶ 24. Under the contracts, the defendants' safety program included employing a safety director and requiring the subcontractors to have "competent supervision," conduct weekly "toolbox talks," and have a general safety manual. *Id.* ¶ 54. Each subcontractor was responsible for all labor, materials, tools, equipment, and supervision and "to do all things necessary for the proper and complete performance of the work." *Id.* ¶ 55. Thus, the general contractor did not retain control of the subcontractor's employee's performance or method sufficient to impose a duty on the general. *Id.*

¶ 67        The evidence in *Fonseca* and *Snow* did not approach the degree of supervision or inspection demonstrated in the testimony by Builtech's witnesses and Foley. We decide the issue of whether the amount of the contractor's control triggers potential liability as a matter of law only when the evidence presented is insufficient to create a factual question. *Wilkerson v. Paul H. Schwendener, Inc.*, 379 Ill. App. 3d 491, 497 (2008). The actual practice of Builtech demonstrates enough close control to survive the summary judgment motion.

¶ 68        Under these facts, we will follow the approach of *Wilkerson*, where this court held summary judgment to be improper. In *Wilkerson*, a genuine issue of material fact existed as to whether (i) general contractor retained sufficient control of subcontractor's work and safety on the construction site and (ii) whether the general contractor knew or should have known of the dangerous condition created by the subcontractor, triggering liability under the plaintiff's

premises liability theory. *Id.*; see also *Bokodi*, 312 Ill. App. 3d 1051 (general contractor promulgated multiple safety measures for subcontractors to follow); *Aguirre v. Turner Construction Co.*, 501 F.3d 825, 829 (7th Cir. 2007) (same).

¶ 69    Regarding duty, the dissent writes that Builtech "clearly" retained control over safety to a degree sufficient, as a matter of law, to render it potentially liable for its own negligence under section 414 (Restatement (Second) of Torts § 414 cmt. a, at 387 (1965)). *Infra* ¶ 94. But the dissent reframes the issue. As the dissent sees it, the issue is "whether Foley has raised a genuine issue of material fact as to whether (i) Builtech breached its duty and (ii) whether that breach was a proximate cause of his injury." *Infra* ¶ 96; see also *Nowak v. Coghill*, 296 Ill. App. 3d 886, 892 (1998) (tow truck driver failed to establish homeowner's duty to shovel snow on driveway). The dissent then concludes that there was no evidence of proximate cause and Foley loses.

¶ 70    Generally, the existence of proximate cause presents a question of fact for the jury. *Nowak*, 296 Ill. App. 3d at 895. Liability may not be based on speculation, imagination, or mere conjecture. *Id.* Nor does the bare possibility of a causal connection raise a factual inference. *Id.* at 896. But where the facts support more than one logical conclusion, circumstantial evidence can be sufficient to establish proximate cause to overcome summary judgment, as long as the inference may reasonably be drawn. *Id.* (citing *Mort v. Walter*, 98 Ill. 2d 391, 396-97 (1983)).

¶ 71    Consider *Nowak*, 296 Ill. App. 3d 886. The plaintiff failed to establish the duty element of his negligence claim, which, by itself, entitled the defendants to summary judgment. *Id.* at 895. The court went on to address the proximate cause element. *Id.* Circumstantial evidence failed to establish with reasonable certainty that the defendant's acts proximately caused the plaintiff to fall because the evidence was unclear as to exactly where the plaintiff fell and as to other possible causes including wet surfaces nearby. *Id.* at 898. We found it unreasonable to infer the plaintiff was on the pile of snow on the edge of the driveway when he fell and, therefore, it was unreasonable to infer that the snow pile caused his fall. *Id.* at 897. Here, Foley injured his back while pulling at the rebar; if Builtech had a duty as the dissent suggests, the question of proximate cause of Foley's injury remains a question of fact.

¶ 72    The dissent also relies on *Gerasi v. Gilbane Building Co.*, 2017 IL App (1st) 133000. *Infra* ¶ 105. In *Gerasi*, nothing in the defendant's contract with the owner of the premises required the defendant to supervise the subcontractors' work—there was "no evidentiary basis for [the plaintiff's] contention that [the defendant] was obligated to do more than it did to ensure that contractors complied with its safety plan." *Gerasi*, 2017 IL App (1st) 133000, ¶ 57. Without these obligations, we held that the plaintiff could not predicate the defendant's liability on its failure to enforce its safety plan. *Id.* Here, however, the facts present a question as to whether Builtech breached its duty by negligently failing to supervise and/or keep the jobsite safe as it had agreed to do and whether that breach was the proximate cause of Foley's injury.

¶ 73                                            *Vicarious Liability*

¶ 74    Builtech also cites a case in which the trial court found neither vicarious nor direct liability. In *LePretre v. Lend Lease (US) Construction, Inc.*, 2017 IL App (1st) 162320, no written contract existed between the general contractor and the plaintiff's employer. The general contractor retained a concrete subcontractor, which in turn retained plaintiff's employer to install rebar for the concrete pour. *Id.* ¶ 3. The general contractor did not provide safety

- 11 -

guidelines as to the installation of the rebar and did not communicate with the plaintiff's employer or any of its employees regarding how to install the rebar, and employees did not look to the general contractor to remedy any sort of alleged safety hazard. Relying on *Carney*, the *LePretre* court pronounced that, if the control retained by the employer gave rise to a master-servant relationship, the employer might be liable for the negligence of the contractor's employees under the laws of agency; "[h]owever, agency law, under which an employer may be vicariously liable for the torts of its employees, is not the same as when an employer is directly liable for its own negligence." *Id.* ¶ 29.

¶ 75 Comment a to section 414 explains,

"If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant." Restatement (Second) of Torts § 414 cmt. a, at 387 (1965).

The *Carney* court, interpreting this comment, stated: "The first sentence of comment a does not explain when section 414 applies. Rather, it explains when section 414 does not apply." *Carney*, 2016 IL 118984, ¶ 38. Citing *Aguirre v. Turner Construction Co.*, 501 F.3d 825, 829 (7th Cir. 2007), the *Carney* court explained:

"If the control retained by the employer is such that it gives rise to a master-servant relationship, thus negating the person's status as an independent contractor, the employer may be liable for the negligence of the contractor's employees under the law of agency. Agency law, under which an employer may be vicariously liable for the torts of its employees, is distinct from the principles encompassed in section 414, under which an employer is directly liable for its own negligence." *Carney*, 2016 IL 118984, ¶ 38.

In other words, "section 414 takes over where agency law ends." (Internal quotation marks omitted.) *Id.*; see *LePretre*, 2017 IL App (1st) 162320, ¶ 28 (recognizing *Carney*'s holding that section 414 only articulates basis for imposing direct liability).

¶ 76 Comment a continues:

"The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, *but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others*." (Emphasis added.) Restatement (Second) of Torts § 414 cmt. a, at 387 (1965).

In other words, in a case where agency principles do not apply to impose vicarious liability on a principal, an exercise of supervisory control without reasonable care taken may create liability.

¶ 77 But where, as here, the evidence of control is not clear-cut, we must reverse. The question is whether a general contractor retained sufficient control over the safety aspects of a project to be liable to an independent contractor's employee for the general contractor's failure to properly exercise that control. *LePretre* distinguishes the facts in *Lederer*, 2014 IL App (1st)

123170, which was called into question by our supreme court in *Carney*. The facts in *Lederer*, however, suggest factors courts should consider in deciding the extent of a general contractor's liability. The *Lederer* court found that although the mere existence of a safety program, safety manual, or safety director is insufficient, standing alone, to impose liability under the retained control exception, the general contractor specifically prohibited one means or method of performing the work—using stilts for drywall work—which was enough to subject it to liability. The evidence showed that laborers looked to the general contractor to remedy a safety hazard and that the general contractor had a strong presence on the site inspecting safety precautions.

¶ 78    Although "[d]efendant's mere presence at the job site, without more, is insufficient evidence of retained control for purposes of section 414" (*Carney*, 2016 IL 118984, ¶ 55), we are presented with more evidence that requires fact-finding regarding each party's role. The two Chicago Town workmen testified through an interpreter, and their deposition transcripts are at times confusing. Also, the photographic exhibits may be probative. According to Bokar, they were not taken after Foley was injured to document where and how the accident happened, so they must have been taken before and show disarray of the rebar. The witnesses' testimony regarding Builtech's supervisory authority raises a question as to how much retained control it had both under the contract and as demonstrated by Bokar's, Ribskis's, and Foley's deposition testimony. And a question of fact remains as to whether this case involves less than a specific prohibition of one means or method of performing the work (*Lederer)* or more than the complete lack of supervision seen in the other cases discussed (*Carney*, *Fonseca*, *Snow*).

¶ 79                                    *Premises Liability*

¶ 80    Additionally, Foley argues that his injury on the construction site was due to unsafe material storage and material handling. Foley asserts a question of fact exists as to whether Builtech had actual or constructive notice of the dangerous condition of the rebar.

¶ 81    Relying on *Carney*, 2016 IL 118984, ¶ 55, Builtech responds that Bokar's "mere presence" at the jobsite does not impute actual or constructive notice under Restatement sections 343 or 414. But the evidence establishes far more involvement by Builtech than the defendant's involvement in *Carney*, where only one person had any interaction with anyone from the defendant railroad. *Id.* Without more, there was no issue of fact regarding whether the railroad retained the control necessary to trigger potential liability. *Id.* ¶ 44. This case presents a different scenario. Section 343 of the Restatement (Second) of Torts entitled "Dangerous Conditions Known to or Discoverable by Possessor" provides:

> "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows *or by the exercise of reasonable care would discover* the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger." (Emphasis added.) Restatement (Second) of Torts § 343 (1965).

¶ 82    The reporter's notes indicate section 343 should be read together with section 343A, the companion section:

"Known or Obvious Dangers

(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." *Id.* § 343A (1965).

The word "known" denotes not only knowledge of the existence of the condition but also an appreciation of the danger of the condition, "and the probability and gravity of the threatened harm must be appreciated." *Id.* § 343A(1) cmt. b (1965).

¶ 83    Regarding sections 343 and 343A of the Restatement (Second) of Torts, the Illinois Supreme Court discussed the lower courts' position that these sections should govern a defendant's possible liability to those lawfully on his or her premises in *Ward v. K Mart Corp.*, 136 Ill. 2d 132, 151 (1990).

"We recognize that the Restatement speaks to the more general question of liability, and not specifically to the existence of a duty. But we think the principles expressed there are consistent with the general duty of reasonable care owed to invitees and licensees, and they are relevant to the resolution of whether an injury was reasonably foreseeable. We emphasize, however, that since the existence of a duty turns in large part on public policy considerations, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden upon the defendant, as well as the likelihood of injury and the possible serious nature of such an injury must also be taken into account." *Id.*

¶ 84    Builtech contends it had no actual or constructive notice because the tangled rebar was "hidden" in the pile. But Bokar testified that he inspected the jobsite daily looking for potential safety hazards. Witnesses agree the site itself was "small," and Bokar stated there was no need for him to have an assistant superintendent to help oversee the project. The excavator's witness stated there was little room to maneuver on the small site, and he had overheard at least one ironworker complaining about the inconvenience of having to get around the excavating being done and the partial foundations that were being built in stages. Alfaro and Ramirez each stated the rebar piles were properly stacked; Foley stated the rebar had been moved and was in disarray. There are genuine issues of material fact as to whether the rebar was stacked in a safe manner or had dirt covering it and whether Builtech's oversight of the jobsite would have revealed an unsafe condition.

¶ 85    The dissent theorizes that if Builtech had seen the "tangled mess" of rebar when Bokar inspected the site before Foley's injury and directed Chicago Town to again restack the tangled rebar, "nothing would have prevented Foley from doing exactly what he did when he was injured: Foley was free to decide to perform the task alone, to refrain from calling for assistance, and to pull on tangled pieces of rebar in an attempt to untangle them." *Infra* ¶ 110. The dissent concludes that this hypothetical scenario demonstrates that Builtech's conduct did not proximately cause Foley's injury. But this argument instead suggests that the condition of the rebar proximately caused Foley's injury—had Builtech ordered the rebar restacked, it would not have been tangled, and Foley would have been able to pull out the rebar he needed, avoiding injury. And Builtech was responsible for the conditions at the jobsite.

¶ 86    The dissent concludes, "Liability under the foregoing scenario would not attach unless a Builtech employee in the normal course of his or her duties observed a subcontractor's employee performing a task in an unsafe manner and failed to stop it" (*infra* ¶ 110). This

creates an impossible standard because, absent firsthand observation of the employee, no contractor would be liable for any injury caused by negligence on a jobsite.

¶ 87 Whether a contractor retained control sufficient to trigger liability presents a question of fact, and the deposition testimony shows Builtech had an employee specifically monitoring safety at the worksite, who was authorized to halt unsafe work practices. Testimony indicated that any Builtech employee was empowered to stop a subcontractor's employees who were doing a dangerous task and Builtech required Chicago Town to comply with Builtech's own safety rules. "[T]he question whether the particular connections and activities in a given case were such that an owner could be deemed to have charge was a question of fact for the jury to determine." *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 322 (1965) (large number of contractors involved in alteration work in several buildings; defendant liable only if it "had charge" of construction operations under Structural Work Act (Ill. Rev. Stat. 1957, ch. 48, ¶ 69)).

¶ 88 The dissent cites premises liability cases affirming summary judgments for defendants that required evidence supporting an inference "that a landowner who did not create a dangerous condition on its premises either knew or should have known of that condition." *Infra* ¶ 111 (citing *Carney*, 2016 IL 118984, ¶ 94, *Hanna v. Creative Designers, Inc.*, 2016 IL App (1st) 143727, and *Tomczak v. Planetsphere, Inc.*, 315 Ill. App. 3d 1033, 1038-39 (2000)). But in each of these cases, no evidence of notice was produced. In contrast, here, the witnesses contradict one another on several points, and Bokar testified as to his own daily involvement in the project. The evidence presented raises an issue of whether Builtech retained sufficient control over the subcontractor's work to trigger liability for its employee's injury. After reviewing *de novo* the pleadings, depositions, exhibits, and admissions on file and construing the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent (*Martinez*, 296 Ill. App. 3d at 611), we cannot say, as a matter of law, that Builtech was entitled to summary judgment. There was sufficient evidence of retained control to present a question of fact.

¶ 89 Reversed and remanded.

¶ 90 JUSTICE MASON, dissenting:

¶ 91 I respectfully disagree with my colleagues' conclusion that genuine issues of material fact exist as to whether Builtech retained control over safety at the work site where Foley was injured. *Supra* ¶ 2. It clearly did. What is missing in this case is any evidence that Builtech breached its duty to Foley or that such breach was a proximate cause of Foley's injury. Nor is there any evidence that Builtech had notice of a dangerous condition on its property so as to support a claim for premises liability. Because these are essential elements of Foley's claims, I would affirm summary judgment in favor of Builtech. Accordingly, I respectfully dissent.

¶ 92 At the outset, I note that Builtech did not control the "means and methods" of Chicago Town's work at the site and so is not vicariously liable for Chicago Town's negligence. I do not equate control over "means and methods," *i.e.*, how the subcontractor completes the work it has agreed to perform, with the ability to stop work being performed in an unsafe manner. Notwithstanding conclusory deposition testimony to the contrary, under its contract with Builtech (who, as general contractor, performed no work of its own on the project), Chicago Town agreed to furnish "all labor, material, service, and equipment" and was responsible for

- 15 -

the handling, unloading, and safe storage of materials necessary to the work it agreed to perform. Chicago Town decided how much and what type of rebar to order, how to store the rebar on-site, the method for placing the rebar in the foundation frames, when and how to pour concrete, and when and how to strip the rebar from the frames. Chicago Town determined which and how many of its employees would be sent to the site to perform the work. Finally, Chicago Town was also responsible for the safety of its employees on the site. Under these circumstances, as a matter of law, Builtech did not control the "means and methods" of Chicago Town's work. See *Carney*, 2016 IL 118984, ¶ 38 ("If the control retained by the employer is such that it gives rise to a master-servant relationship, thus negating the person's status as an independent contractor, the employer may be liable for the negligence of the contractor's employees under the law of agency."). Consequently, although Foley asserted in the trial court that Builtech could be vicariously liable under agency principles for Chicago Town's negligence, this contention, abandoned on appeal, is wrong as a matter of law.

¶ 93 But under the evidence in this case and under the law, Builtech clearly retained control over safety sufficient to potentially implicate direct liability for its own negligence under section 414. "One who entrusts work to an independent contractor, but who retains control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965). The terms of its contract with the owner, the provisions of its safety manual, and the testimony of its employees all establish that Builtech had general supervisory authority over the work of subcontractors at the site and the authority to stop that work if it was being performed in an unsafe manner and that subcontractors were obligated to adhere to such directions. There is also no dispute that Builtech owed a duty of care to those on the premises, including Foley, to use reasonable care in exercising its retained control over safety. Builtech had, in fact, exercised that authority before the date of Foley's injury when Bokar directed that safety caps be placed on the strips of rebar and directed a Chicago Town employee to don a safety vest. See *Wilkerson*, 379 Ill. App. 3d at 497 ("Although the contract between [the subcontractor] and defendant seemingly left to [the subcontractor] control of the operative details of its work and the safety of its employees, defendant's actions on the jobsite show defendant retained more than a general right of supervision. The best evidence of this is the December 12, 2002, letter asserting defendant's discretionary authority to stop [the subcontractor's] work.").

¶ 94 Given this evidence, the majority correctly invokes *Wilkerson* but, instead of finding that a duty exists, concludes that issues of fact remain on that question and reverses. I disagree with this analysis. The control retained by Builtech was sufficient, as a matter of law, to render it potentially liable for its own negligence under section 414. Restatement (Second) of Torts § 414 cmt. a, at 387 (1965) (one who hires an independent contractor "may retain only the power *** to forbid [the work] being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work he has ordered to be done from causing injury to others."); *Bokodi*, 312 Ill. App. 3d at 1063 (general contractor "went to great lengths to control the safety standards at the work site").

¶ 95 The existence of a duty under section 414 is not the real issue in this case. Rather, the real issue is whether Foley adduced any evidence that anything Builtech did or failed to do within

the scope of its retained control over safety proximately caused or contributed to his injury. In other words, the issue is whether Foley has raised a genuine issue of material fact as to whether (i) Builtech breached its duty and (ii) whether that breach was a proximate cause of his injury. He has not. The existence of a duty without evidence of a breach or proximate cause is fatal to Foley's claim. See *Carney*, 2016 IL 118984, ¶ 26 ("the plaintiff must plead and prove the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and injury proximately resulting from the breach"); *Milevski v. Ingalls Memorial Hospital*, 2018 IL App (1st) 172898, ¶ 28 (same); *Snow*, 2017 IL App (1st) 151226, ¶ 49 (same); see also Illinois Pattern Jury Instructions, Civil, No. 55.03 (2011) (plaintiff in construction negligence case has burden to prove that (i) defendant retained some control over the safety of the work, (ii) defendant acted or failed to act in specified ways, and in so acting or failing to act, was negligent in that manner in which it exercised, or failed to exercise, its retained control, (iii) plaintiff was injured, and (iv) defendant's negligence was a proximate cause of plaintiff's injuries).

¶ 96    In order to establish the existence of a genuine issue of material fact on the issues of breach and proximate cause, it was incumbent on Foley to point to some evidence in the record supporting the reasonable inference that Builtech knew or should have known of the condition of the pile of rebar before his injury and, in the exercise of its retained control over safety, was in a position to prevent that injury. Restatement (Second) of Torts § 414, cmt. b, at 387-88 (1965) (general contractor may be liable for its own negligence if it "fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if [it] knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which [it] has retained"); *Id.* § 343 (1965) (landowner may be liable for injury to invitee by condition on land, but only if landowner "(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger"). The evidence shows that when the rebar was delivered, Chicago Town employees, consistent with the provisions of its subcontract with Builtech, accepted delivery and stacked the material on the site. When directed to do so by Builtech to accommodate excavation work, Chicago Town employees moved the rebar and restacked it. The Chicago Town employees involved in this task testified that they restacked the rebar properly. There is absolutely no evidence in the record that Builtech was obligated to or actually did supervise or direct the manner in which this task was performed. Accordingly, if there was a dangerous condition as a result of the way in which the rebar was stacked, that condition was created solely by Foley's coworkers. Moreover, Foley readily admitted that he recognized that the rebar he attempted to pull from the pile was tangled and knew from his 20 years' experience as an ironworker how he should go about removing pieces from the pile and, in particular, what he should *not* do in an effort to accomplish that task.

¶ 97    The question then is whether Builtech, in advance of Foley's injury, knew or should have known of an unsafe condition in the stacked rebar so that it can potentially be held liable for

(i) failing to exercise its retained control over safety by directing that the rebar again be restacked or (ii) a dangerous condition on the land.[1]

¶ 98        On this point, Foley offers only speculation. There is no evidence that before the date Foley was injured any Builtech employee (or any Chicago Town employee, for that matter) noticed or was advised of any unsafe condition with respect to the rebar stored on the site. If Bokar had seen tangled rebar on the site, he would have directed Chicago Town to restack it. Foley himself admitted that, when he arrived early on the morning of May 21, he noticed nothing dangerous about the pile of rebar. Before Foley started working, he did not observe that the stacked rebar was "buried" or a "tangled mess." It was only after 45 minutes, during which Foley removed about two dozen pieces of rebar from the stack, that he noticed that shorter pieces "hidden underneath" were tangled. See *Pestka v. Town of Fort Sheridan Co.*, 371 Ill. App. 3d 286, 302-03 (2007) (general contractor not liable as a matter of law for injury to employee of subcontractor when employee was injured shortly after he began loading I-beams on a trailer and no one from general contractor was present); *Cochran*, 358 Ill. App. 3d at 879-80 (where unsafe ladder setup had been in place for only an hour before plaintiff's injury and there was no evidence that any of general contractor's employees observed or knew of setup before accident, summary judgment in favor of general contractor affirmed).

¶ 99        Foley points to photographs in the record of the pile of rebar, but the originals of the photos have not been provided to this court, the black and white photographs are indecipherable, the color photos are far from clear, and no witness was able to state when those photographs were taken. That being the case, it is impossible to say whether the photographs accurately reflect how the materials appeared on the date of Foley's injury. Moreover, if the photos were taken after Foley's injury, they show only how the rebar appeared *after* Foley had removed two dozen pieces of rebar to discover the shorter, tangled rebar hidden underneath. Consequently, because no witness was able to say when the photographs were taken and what they depict, their admissibility is questionable, and their relevance is marginal, at best.

¶ 100        Under these facts, any finding that Builtech breached its duty to exercise control over safety or is responsible for a dangerous condition on the premises because it knew or should have known of the unsafe condition of the rebar would be based not on evidence but on speculation. A trier of fact would have to speculate that even though (i) no Builtech employee saw a dangerous condition on the property before or on May 21, (ii) no one, including no employee from Chicago Town, had advised Builtech of a dangerous condition regarding the rebar before May 21, and (iii) Foley himself, an experienced ironworker, saw no dangerous condition when he arrived on May 21, Builtech should have known through some unidentified source about the tangled rebar. No verdict in Foley's favor based on such speculation could stand. See *Milevski*, 2018 IL App (1st) 172898, ¶ 27 ("[M]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." (Internal quotation marks omitted.)).

¶ 101        Further, beyond the lack of evidence that Builtech breached its duty to oversee safety on the work site, there is likewise a complete absence of any evidence that such failure proximately caused Foley's injury. Foley was injured when, contrary to his 20 years of experience and training as an ironworker, he attempted to pull a piece of rebar that had become

---

[1]Because Builtech performed no work of its own at the site and Chicago Town was responsible under its contract for the handling, unloading, and safe storage of the rebar, only Chicago Town would have been responsible for restacking the material.

- 18 -

tangled with other pieces and did so in a way that injured his back. Foley admitted that he required no training or supervision to move the rebar and that he had previous experience in separating rebar when pieces had become tangled. In violation of the provisions of Builtech's safety manual ("If the load is awkward or heavy to lift, get help"; "Do not jerk the load"), Foley admitted that in attempting to remove rebar from the pile he both jerked it and then pulled as hard as he could to try to free it. In other words, Foley did exactly what Builtech's safety manual told him not to do and, as a result, injured himself.

> "Q. So when you were jerking it, that's when you felt the pop in your neck?
>
> A. Yeah, but sometimes that's the only way you can get bars out if you jerk them hard enough."

¶ 102    Foley admitted that, upon discovering the tangled rebar, he could have called Mike Chapman, Chicago Town's owner, and asked for another ironworker to assist him but decided not to because he knew Chapman wanted to start pouring concrete by noon that day.[2] Further, although Chicago Town had two laborers on-site, union rules prevented anyone but ironworkers from handling rebar, and Foley did not pursue obtaining permission for the laborers to help him. And according to Foley, he did not see any Builtech employee on the work site that morning. So the conclusion is unavoidable that Foley decided to perform a task in an unsafe manner and at a time when no Builtech employee was present to observe him, much less prevent him from doing so.

¶ 103    Accordingly, just as discussed above regarding the existence of a breach, any conclusion that Builtech's conduct proximately caused Foley's injury would be based on improper speculation that, even though no Builtech employee saw Foley handling the rebar in an unsafe manner, Builtech could have somehow prevented Foley's injury. See *Nowak v. Coghill*, 296 Ill. App. 3d 886, 895 (1998) ("[P]roximate cause can only be established when there is a reasonable certainty that defendant's acts caused plaintiff's injury. [Citation.] Although a plaintiff need not prove his case at the summary judgment stage of the proceedings, if he fails to present sufficient evidentiary facts to support the elements of his cause of action, including the proximate cause element, then summary judgment in favor of the defendant is appropriate.").

¶ 104    We recently addressed similar issues and affirmed summary judgment in favor of a general contractor in *Gerasi v. Gilbane Building Co.*, 2017 IL App (1st) 133000. In that case, Gerasi, an electrical subcontractor's employee, was injured when he attempted to provide temporary power for a welder by connecting the equipment to an available breaker in the building's electrical system. The breaker was defective (a fact unknown to Gilbane, the general contractor), and Gerasi, contrary to Gilbane's safety manual, failed to use available protective equipment for his eyes, face, and hands. Gerasi was a journeyman electrician and had performed such temporary power connections hundreds of times before without wearing protective equipment. No Gilbane employee observed Gerasi at the time of the accident. As here, Gerasi sued Gilbane as the general contractor, alleging that it had a duty to stop work being performed in an unsafe manner and failed to provide safety gear and a safe place to work.

¶ 105    For purposes of the analysis we assumed that the general contractor retained control over safety sufficient to trigger potential liability under section 414. *Id.* ¶ 52. We then assessed the

---

[2]Foley testified: "I was trying to do right by Mike without having to *** let him get his laborers out there and give me a hand."

- 19 -

evidence to determine whether "Gilbane negligently breached a duty within the scope of its retained control and [whether] its breach proximately caused Gerasi's injuries." *Id.* ¶ 53.

¶ 106    As to Gilbane's alleged negligence in enforcing its safety plan, we noted that nothing in Gilbane's contract with the owner of the premises required it to provide full-time supervision of subcontractors' work on the project. We found that Gilbane's preparation of a detailed safety plan, the commitments it obtained from subcontractors to adhere to that plan, and its weekly safety meetings with subcontractors all fulfilled the duty Gilbane owed pursuant to its retained control over safety. *Id.* ¶ 57. We further found that, "in the undisputed absence of any requirement that Gilbane personally supervise tie-ins to ensure that they conformed to its safety plan *** , nothing that Gilbane did or failed to do contributed to Gerasi's accident." *Id.* ¶ 60.

¶ 107    We also observed that Gerasi had adduced no evidence that Gilbane knew or should have known that the subcontractor's employees were performing power connections in an unsafe manner or that there were defects in the breakers that posed a hazard to electricians so as to implicate premises liability. *Id.* ¶ 64. Gilbane's construction manager was not required to be on-site full time, and there was no evidence he ever personally observed any electrician performing a temporary power connection in an unsafe manner or that he should have known that electricians were not using safety equipment when they were doing so. *Id.* ("Thus, at bottom, Gerasi's claim is based on the circumstances that Gilbane did not insist on a procedure for a temporary tie-in that had never before been used and did not warn Gerasi of a dangerous condition that Gilbane did not know or have reason to know existed."). We ultimately concluded that no genuine issue of fact existed regarding Gilbane's breach of duty or proximate cause, either as to its retained control over safety or regarding Gerasi's premises liability claim, and affirmed summary judgment in Gilbane's favor. *Id.* ¶ 67.

¶ 108    The analysis in *Gerasi* applies with equal force to this case. As in *Gerasi*, pursuant to its contract with the owner, Builtech was not obligated to provide full-time supervision on-site. So when the majority observes that "[p]art of Bokar's job was to stop a worker from improperly lifting a heavy item" (*supra* ¶ 10), the unspoken assumption is that Builtech had a duty to provide full-time supervision on the site, which is refuted by the terms of its contract with the owner. Likewise, the terms of Builtech's contract with the owner did not prevent Builtech from delegating primary responsibility for work site safety to the various subcontractors it hired to work on the project. See *LePretre*, 2017 IL App (1st) 162320, ¶ 44 (noting that general contractor had delegated its responsibility for trade-specific safety and workmanship to its subcontractors). Bokar testified that he visited the site every day but spent the majority of his time in Builtech's office across the street coordinating the schedules of subcontractors on the project. Also, just as in *Gerasi*, Builtech had an extensive safety manual that it required its subcontractors to adhere to, and Bokar conducted weekly safety meetings. Builtech's manual covered all aspects of work site safety, including the proper methods workers should use for lifting heavy material. Foley's experience and training as an ironworker taught him that he should not attempt to pull or jerk tangled pieces of rebar, and he admitted that the piece of rebar he was attempting to remove from the pile moved only slightly when he initially pulled it. Instead of getting help, Foley continued to pull and jerk the rebar in an effort to remove it, causing his injury. Just like the plaintiff in *Gerasi*, Foley was an experienced ironworker handling rebar as he had hundreds of times before, no one from Builtech observed him handling

- 20 -

the rebar, and nothing Builtech did or failed to do contributed to the unsafe manner in which he chose to handle it.[3]

¶ 109　That Builtech's conduct did not proximately cause Foley's injury is best illustrated by assuming that, as Foley contends, Builtech should have seen the "tangled mess" of rebar when Bokar inspected the site either before or earlier in the day of Foley's injury. If, as a result, Builtech directed Chicago Town to again restack the tangled rebar, nothing would have required Builtech to oversee that task, and nothing would have prevented Foley from doing exactly what he did when he was injured: Foley was free to decide to perform the task alone, to refrain from calling for assistance, and to pull on tangled pieces of rebar in an attempt to untangle them. Liability under the foregoing scenario would not attach unless a Builtech employee in the normal course of his or her duties observed a subcontractor's employee performing the task in an unsafe manner and failed to stop it. This is precisely the evidence that is missing in this case.

¶ 110　Although the majority posits that this creates an "impossible standard" (*supra* ¶ 87), it is no more impossible than in countless premises liability cases in which the plaintiff must adduce evidence from which it can be inferred that a landowner who did not create a dangerous condition on its premises either knew or should have known of that condition. Absent such evidence, summary judgment is proper. See, *e.g.*, *Carney*, 2016 IL 118984, ¶ 94 ("no evidence was presented that defendant knew or should have known the extent to which the transition plate on the Polk Street bridge extended into the roadbed"; summary judgment against plaintiff affirmed); *Hanna v. Creative Designers, Inc.*, 2016 IL App (1st) 143727, ¶¶ 10, 14 (stylist at hair salon injured when flip-top counter fell on her shoulder; no evidence that operator of salon had actual or constructive notice of any defect in the countertops; summary judgment against plaintiff affirmed); *Tomczak v. Planetsphere, Inc.*, 315 Ill. App. 3d 1033, 1038-39 (2000) (plaintiff injured as a result of water on surface of roller skating rink; no evidence adduced of how long water had been on surface; "[u]nder these circumstances, liability cannot be imposed upon the owner for the presence of a substance that no one had knowledge of immediately prior to the occurrence. To do so would be to make the owner the insurer of the safety of the plaintiff" (citing *Olinger v. Great Atlantic & Pacific Tea Co.*, 21 Ill. 2d 469, 476 (1961))).

¶ 111　Foley can point to no affirmative duty imposed on Builtech, either under its contracts with the owner and Chicago Town or under the law, to supervise the activities of all employees on the work site to make sure they were performing their respective tasks safely. Imposing liability under the circumstances here would effectively render Builtech the insurer of the safety of all subcontractors' employees on the work site and would penalize it for implementing safety manuals and otherwise exercising supervisory control over safety. See *Carney*, 2016 IL 118984, ¶ 61. Builtech did not create the allegedly unsafe condition of the rebar, and the record contains absolutely no evidence that Builtech knew or should have known of that condition before Foley was injured.

¶ 112　Whether viewed as a failure to raise a genuine issue of material fact as to (i) Builtech's breach of duty or (ii) the proximate relationship between that breach and his injury, or both,

---

[3]Indeed, Builtech's safety manual has the same provisions regarding provision of temporary power at issue in *Gerasi*. If Foley had been an electrician performing a temporary power connection and no one from Builtech observed him or had reason to know that he was performing the task in an unsafe manner, *Gerasi* would be indistinguishable from this case.

Foley's claims premised on negligence and premises liability fail as a matter of law and were properly resolved on summary judgment.